Filed 8/13/14  P. v. Rodriguez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039197 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F21789) |
| v. | |
| ISMAEL PLACENCIA RODRIGUEZ, | |
| Defendant and Appellant. | |

Defendant Ismael Placencia Rodriguez appeals from a judgment of conviction entered after he pleaded guilty to street terrorism (Pen. Code, § 186.22, subd. (a)) and possession of an assault weapon (Pen. Code, former § 12280, subd. (b)).  Pursuant to the negotiated plea agreement, the trial court suspended imposition of sentence and granted probation for 36 months.  On appeal, defendant contends that the trial court erred in denying his motion to suppress evidence.  Defendant also requests that this court independently review the sealed portion of the search warrant.  We find no error and affirm the judgment.

## I.  Statement of Facts

On November 10, 2011, police officers conducted a surveillance of the area of 624 Rodriguez Street in Watsonville.  It appeared that a gang meeting had taken place at that

address, because they observed several Norteno gang members leaving the residence. Based on this information, Detective Morgan Chappell applied for a search warrant in which he stated his expertise and the reasons supporting probable cause. He also listed the places and persons to be searched in addendum #1 and described the things to be seized in addendum #2, and requested that "a search warrant be granted for the residence and vehicles under Rodriguez'[s] dominion and control."

The magistrate approved a warrant which stated in relevant part: "You are therefore commanded to search the following: See addendum #1, incorporated herein as reference." (Capitalization omitted.) Addendum #1 stated: "PROPERTY: The home of Ismael Rodriguez is described as follows: [¶] Main house is two story, green wood siding with blue trim and a brown composite roof. [¶] A black iron security door covers the front door. [¶] On the right hand side trim to the front door is 624 in gold letters aligned vertically. [¶] Front door faces west towards Rodriguez [S]t. [¶] There is a detached garage behind the main house. [¶] There are three other detached outbuildings. [¶] There is a second door on the south side that has 624A in black numbers attached to the porch beam. [¶] The residence includes all rooms, closets, locked containers, attics, basements, garbage bins, storage areas, garages, outbuildings, sheds, and yards that are[] associated with the residences." Detective Chappell believed that the search warrant authorized the search of vehicles on the premises, but Detective Albert Lopez "wasn't completely sure" whether it did.

At approximately 8:00 p.m. on November 11, 2011, police officers, including Detectives Chappell and Lopez, went to defendant's residence at 624 Rodriguez Street to execute the search warrant. Detective Lopez spoke to Irma Placencia, defendant's mother, and informed her that they were there to execute the search warrant.

When the officers searched the living room, they found a loaded .38 caliber handgun under the couch where defendant slept. They also found defendant's

identification cards, several items of red clothing, and a binder with gang writings near the couch.

After searching the house, the officers went out to the yard associated with the property. There was a driveway adjacent to the residence that led to a parking area at the rear of the house. Some parts of the driveway and parking area were paved. The unpaved portion of the area was covered with gravel and weeds. There were six to eight vehicles at this location. Placencia indicated that a utility van and a cargo truck, which were blocked in by the other vehicles, belonged to their family.

Detective Chappell described the utility van as "clearly abandoned, didn't look like it had been moved for a long time. There were mattresses, dirty older mattresses tossed into the cargo area of the van. It looked banged up. I think one of the tires was flat. It didn't appear to me like the thing would start." Grass and weeds were growing around the vehicle's tires. Officers searched the utility van and found several rounds of ammunition.

Officers also searched the cargo truck. According to Detective Chappell, the truck did not "look like it had been moved in a long time. And it appeared to be more of a storage container than anything else. . . . It was pretty dirty. There was plastic draped around the truck. And . . . somebody had written with their finger in the dust on the outside of the truck different references to the Norteno gang WVN subset." "WVN" stands for Watson Varrio Norteno. There were also wooden pallets, which were not secured properly, under the plastic tarp on top of the truck. There were no tire tracks leading to where the cargo truck was parked, and grass and weeds were growing around the vehicle. When Detective Chappell tried to open the cargo truck, he discovered that there was a padlock on the side of the vehicle. However, though the back doors could be opened, one could not reach the front area of the cargo truck because it was packed with store merchandise. Placencia told Lopez that she stored "things" in the cargo truck, and that defendant had placed the lock on it about a year ago. After searching the cargo

3

truck, the officers found an impact riot gun, which had been reported stolen by a San Jose police officer, and two rifles.

Placencia was never asked whether the utility van and the cargo truck were operable. Detectives Chappell and Lopez also did not attempt to start either vehicle.

When Detective Lopez returned to the residence in February 2012, he examined the gravel area and observed that the utility van and the cargo truck were in the same condition that they had been in November 2011. He also noted that there were no tire marks in the gravel near the vehicles, thus indicating that they had not been moved after the search warrant was executed.

## II. Discussion

### A. Motion to Suppress Evidence

Defendant contends that the trial court erred when it denied his motion to suppress evidence because the officers' search included vehicles that were not authorized by the search warrant.

In denying the motion to suppress evidence, the trial court found that the request for the warrant specifically mentioned vehicles, the addendum failed to mention these vehicles due to poor drafting, and the officers thought that they were authorized to search the vehicles. Thus, the trial court concluded that application of the exclusionary rule would not deter police misconduct. The trial court also stated: "Now turning to the storage areas, looking at these photographs and testimony these appear to be storage areas. Looking at what's inside of the vehicles and what's on top of these vehicles and location that they are located, all appears to be this is where the defendant's mother was storing a lot of her things and the family was storing a lot of their things. The tarps and everything else about the vehicles indicates these are more storage areas than they were operable vehicles being used on a daily basis. [¶] I find them to be storage units."

4

" 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]' " (*People v. Weaver* (2001) 26 Cal.4th 876, 924, quoting *People v. Glaser* (1995) 11 Cal.4th 354, 362.)

Both the state and federal Constitutions require that a search warrant particularly describe the place to be searched. (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13.) As the California Supreme Court has observed: " 'The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.' (*Maryland v. Garrison* (1987) 480 U.S. 79, 84.) This purpose—to limit the search authorization to things and areas for which probable cause exists and avoid exploratory searches—must be kept in mind in determining the validity of a warrant containing an inaccurate description of the place to be searched. '[T]he purpose of the exclusionary rule is ". . . to deter illegal police conduct, not deficient police draftsmanship . . . ." ' (*People v. Superior Court* (1980) 101 Cal.App.3d 218, 224.) [¶] Complete precision in describing the place to be searched is not required. 'It is enough if the description is such that the officer with a search warrant can with reasonable effort ascertain and identify the place intended.' (*Steele v. United States* (1925) 267 U.S. 498, 503.)" (*People v. Amador* (2000) 24 Cal.4th 387, 392.) "Whether a warrant's description of property to be seized is sufficiently particular is a question of law subject to independent review by an appellate court. [Citation.]" (*People v. Eubanks* (2011) 53 Cal.4th 110, 133.)

5

Defendant argues that since the search warrant did not mention vehicles or specifically include parking areas or driveways, the officers exceeded the scope of the search warrant. We disagree.

In the present case, the warrant incorporated an addendum that described the place to be searched as defendant's home. There is no dispute that the officers identified and searched the correct residence. We also note that nothing in the warrant excludes defendant's vehicles from its scope. At issue is whether the addendum sufficiently described the location where the vehicles were found. As our Supreme Court has concluded, "a warrant supporting the search of a motor vehicle must, at the very least, include some explicit description of a particular vehicle or of *a place where a vehicle is later found*. [Citation.]" (*People v. Dumas* (1973) 9 Cal.3d 871, 881, italics added.)

Here, the addendum stated that the property to be searched included a "main house" and "three other detached outbuildings," and defined "residence" as "includ[ing]" "yards that [are] associated with the residences." Defendant argues that the parking area and driveway were "clearly distinct" from the yard. However, a yard is defined as "the grounds of a building or group of buildings." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 1365.) In our view, a parking area and driveway would be commonly understood as part of the yard associated with the residences. This interpretation would satisfy the purpose of the particularity requirement, since it would avoid exploratory searches by the police. Accordingly, the warrant described the area to be searched with sufficient particularity.

Even if we construed the scope of the warrant to authorize a search of only those locations expressly mentioned in addendum #1, the trial court properly denied the motion to suppress evidence on the ground that the utility van and cargo truck qualified as "storage areas."

In *People v. Childress* (1979) 99 Cal.App.3d 36 (*Childress*), the warrant authorized the search of " '[a]ll storage areas and containers located both inside and

6

outside the premises'" that were under the defendant's control. (*Id.* at p. 42.) The officers searched a vehicle that was "inoperable and stationary and was parked in the defendant's back yard. In addition, the vehicle was filthy with trash on both front and rear floorboards and paper strewn about the front seat. It was parked in a grassy area, with no tire marks leading to the vehicle." (*Ibid.*) Thus, *Childress* held that, under these facts, "the 'vehicle' was used as a storage area within the purview of the warrant." (*Ibid.*)

Similarly, here, there was substantial evidence to support the trial court's finding that the utility van and cargo truck were used as storage areas and thus included in the warrant as areas to be searched. Grass and weeds were growing around the tires of both vehicles and both vehicles were blocked in by other vehicles. Dirty, old mattresses had been placed in the "banged up" utility van and one of its tires was flat. According to Detective Chappell, it had been "clearly abandoned, didn't look like it had been moved for a long time." The cargo truck was "pretty dirty" and packed with store merchandise. There were also wooden pallets, which were not secured properly, under the plastic tarp on top of the cargo truck. Moreover, Placencia told the officers that she used the cargo truck to store "things." Three months later, the utility van and the cargo truck were in the same condition that they had been in November 2011, and there were no tire marks leading to these vehicles.

Defendant contends that the present case is factually and legally distinguishable from *Childress*. He argues that, in contrast to *Childress*, here, "there was no affirmative evidence" that the vehicles were "inoperable," and "the trial court did not deem the vehicles as storage areas *and nothing more*." However, *Childress* did not hold that there must be "affirmative evidence" that a vehicle is inoperable in order to establish that it as a storage area. *Childress* concluded that "the manner of *use* of the vehicle and its inoperable condition (which had existed for an obviously lengthy period of time) established it as a storage facility *and nothing more*." (*Childress*, *supra*, 99 Cal.App.3d at p. 43.) Here, as previously discussed, there were several factors indicating that the

7

vehicles were inoperable and had not been used as anything other than as storage areas for a considerable amount of time.

Defendant also argues that, "in *Childress*, the vehicle was in the defendant's backyard, which was expressly covered by the scope of the warrant." In *Childress*, the warrant authorized a search of "storage areas . . . outside the premises." (*Childress*, *supra*, 99 Cal.App.3d at p. 42.) Here, the warrant authorized a search of the "storage areas" and "yards . . . associated with the residences." We disagree with defendant that there is a significant distinction between the use in the warrant of "storage areas . . . outside the premises" in *Childress* and the use of "storage areas" and "yards" in the case before us.

In sum, we conclude that the trial court did not err when it denied defendant's motion to suppress evidence.

**B.  Review of the Sealed Portion of the Affidavit**

Defendant also asks this court to review the sealed portion of the affidavit underlying the search warrant authorizing the search of his residence. The Attorney General does not oppose this request.

Here, defendant did not file a motion to quash the search warrant. Instead, he filed a motion to suppress in which he argued that the warrant contained no probable cause justifying the search. Attached to the motion was a copy of the unsealed portion of Detective Chappell's affidavit in support of the search warrant. The unsealed portion of the affidavit includes a statement of the officer's training, experience, and expertise; a description of defendant and his place of residence; a request to search his residence and vehicles under his control; and a request to seize evidence of gang membership, including weapons.

After conducting an in camera hearing of the sealed portion of the search warrant affidavit, the trial court ordered a portion of it unsealed and to be turned over to the

8

defense.  The trial court ordered that the remaining portion be sealed.  The trial court also found that there was probable cause for issuance of the search warrant.

In *People v. Hobbs* (1994) 7 Cal.4th 948 (*Hobbs*), the California Supreme Court held that a major portion or all of the search warrant affidavit may be sealed to protect the identity of a confidential informant if certain procedures are followed to preserve the defendant's right to challenge the validity of a search warrant.  (*Id.* at pp. 955, 971-975.)  At the hearing, the trial court must determine:  whether the affidavit has been properly sealed (*id.* at pp. 972-973), and "whether, under the 'totality of the circumstances' presented in the search warrant affidavit and the oral testimony, if any, presented to the magistrate, there was 'a fair probability' that contraband or evidence of a crime would be found in the place searched pursuant to the warrant.  [Citations.]"  (*Id.* at p. 975.)

We have independently reviewed the appellate record, including the sealed and unsealed portions of the search warrant affidavit.  We agree with the trial court that if the information in the sealed document were disclosed, the identity of the confidential informant might be revealed.  Thus, the sealed portion of the affidavit was properly ordered to remain sealed.  (*Hobbs*, *supra*, 7 Cal.4th at pp. 972-973.)  We also find that, under the totality of the circumstances presented in the search warrant affidavit, there was a fair probability that contraband or evidence of a crime would be found in defendant's residence.  (*Id.* at p. 975.)  Accordingly, we conclude that no Fourth Amendment violation occurred.  (See *Illinois v. Gates* (1983) 462 U.S. 213, 238.)

## III.  Disposition

The judgment is affirmed.

 

_____

Mihara, J.

WE CONCUR:

_____

Elia, Acting P. J.

_____

Grover, J.